IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 19-cv-03587-RBJ

JAMES RAINER TWIFORD, JR.,

    Plaintiff,

v.

CORRECTIONAL HEALTH PARTNERS, LLC,
PHYSICIAN HEALTH PARTNERS, LLC,
BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF PUEBLO COLORADO
a/k/a "PUEBLO COUNTY',
KIRK M. TAYLOR, individually and in his official capacity as Pueblo County Sheriff,
STEFANIE ARNOLD, individually,
LEAH BAYNES, individually,
LAURA ETHRIDGE, individually,
ERIC WOODRUFF, individually,
BRIANA BOUGHTON, individually,
MARIA DORN, individually,
MANDY BARRERAS, NP, individually,
CHRISTINE KUTNAK, individually,
SHARON ALLEN, MD, individually,
JONATHAN SLATER, individually,
CASSIE SIMMONS, individually,
REBECCA ALTERTON, individually,
CALEB GONZALES, individually,
MONIKA LOVRIC, individually,
CHARLEE MERCER, individually,
DONNA [LAST NAME UNKNOWN], individually,
JILL HOGGARTH, individually,
WILLIAM CARRERO, individually,
STEVEN DAWSON, individually,
KIRK M. TAYLOR, individually,
JEREMY CARDONA, individually,
SANDY PURKETT, individually,
WELLINGTON DUPLESSIS, individually,
MATTHEW MATTOT, individually,
MICHAEL QUINTANA, individually,
DAVID SPICER, individually,
FELIX GALLARDO, individually,

ROMAN HIJAR, individually,
NICOLAS BERUMEN, individually,
ROBERT VIGIL, individually,
JACOB MAHAN, individually,
JACOB BOOKOUT, individually,
CHAZ BRYANT, individually,
CURTIS MARTINDALE, individually,
DOMINIC MONTOYA, individually,
ALEXA KOMORNIC, individually,
CHRISTOPHER MOLINA, individually,
ELY DYNES, individually,
VANESSA PADILLA, individually,
MICHAEL CHITWOOD, individually,
SHELLEY BRYANT, individually,
[FIRST NAME UNKNOWN] SYKES, individually,
JOHN AND JANE DOES 1-10; and
DOE CORPRATIONS 1-10,

    Defendants.

## ORDER – MOTION TO DISMISS

The four remaining defendants move to dismiss the claims against them in plaintiff's First and Second Claims for Relief pursuant to Fed. R. Civ. P. 12(b)(6). ECF No. 48. The Court grants the motion as to the three individual defendants but denies the motion as to the Board of County Commissioners of Pueblo County.

### I. FACTS ALLEGED BY PLAINTIFF.

The Court construes as true for the purpose of this motion the following facts that are alleged in the plaintiff's First Amended Complaint, ECF No. 36, and that appear to be relevant to the claims and defendants that are the subjects of the pending motion.

1.     James Rainier Twiford, Jr., has a history of mental health issues that he treats with antipsychotic medication.

2. On D

3. December 21, 2017 Mr. Twiford was arrested on a warrant for failure to appear and was brought to the Pueblo County Detention Center ("PCDC" or "the jail").

4. During the intake process Mr. Twiford told Stephanie Arnold, a healthcare worker, that he was taking two prescribed medications, Seroquel and Abilify, for bipolar disorder, schizoaffective disorder, and post-traumatic stress disorder. He also told her that his pharmacy was Walgreens, that he had a history of drug addiction, and that the medications helped to manage his addiction.

5. Ms. Arnold told Mr. Twiford that he would not receive Seroquel at the PCDC because it was not on the formulary of Correctional Health Partners, the LLC contracted to provide medical care in the jail. Mr. Twiford was not provided Seroquel, Abilify, or any substitute medications.

6. Mr. Twiford alleges that it is known in the medical community that discontinuation of antipsychotic medication without gradual and supervised tapering is dangerous.

7. Within 24 hours Mr. Twiford began to experience delusions and persecutory thoughts. He believed he would be killed in the jail unless he escaped.

8. Between December 22 and 25, 2017 Mr. Twiford informed numerous individuals of his delusional beliefs and his need for the medications. These individuals included medical personal (Ms. Arnold; Leah Baynes; Laura Ethridge; Briana Boughton; and Jill Hoggarth) and correctional officers (William Carrero; Steven Dawson; Jeremy Cardona; Sandy Purkett; David

Spicer; Felix Gallardo; Michael Quintana; Mathew Mattot; Wellington Duplessis; Roman Hijar; Nicolas Berumen; and Robert Vigil).

9. None of these individuals did anything to help Mr. Twiford with his request for medications.

10. All those individuals plus Mandy Berreras, N.P., Sharon Allen, M.D., Correctional Health Partners, and the Board of County Commissioners of Pueblo County ("Pueblo County") were named as defendants in Mr. Twiford's original complaint. However, plaintiff has voluntarily dismissed his claims against all the named defendants except Pueblo County and three correctional officers: Captain Purkett, Deputy Berumen, and Deputy Vigil.

11. Captain Purkett interviewed Mr. Twiford to determine why he was so distressed. He told her about his delusions, auditory hallucinations, prescription medications, and inability to sleep. Her incident report indicated that his statements were not making sense, and that she "believed him to be a mental health subject."

12. Captain Purkett called the Denver Jail to inquire about his medical history there. However, a Denver deputy told her that they did not have a record of Mr. Twiford's being on medication while he was in custody there earlier in 2017. No further attempt was made by Captain Purkett or others under her supervision to confirm Mr. Twiford's medications.

13. Mr. Twiford became increasingly paranoid when he perceived that Captain Purkett would not help him. He believed he was being held in the PCDC by hired actors who planned to kill him.

14. Captain Purkett proposed to move Mr. Twiford to a solitary confinement unit. When she and several other officers approached the room in which she had interviewed Mr.

Twiford, Deputy Duplessis told him that he was being relocated and told him to turn around and kneel down. Mr. Twiford, fearing for his life, refused to comply.

15. Deputy Duplessis perceived Mr. Twiford's noncompliance and physical stance as aggressive, and he tased him. Mr. Twiford was then handcuffed by Deputies Mattot and Quintana, and he was moved into the administrative segregation unit. The tasing was painful to Mr. Twiford.

16. In April 2016 the National Commission on Correctional Health Care issued a position statement indicating its opinion that solitary confinement should not be used for persons with mental illness because it is "harmful to an individual's health."

17. Mr. Twiford has little recollection of the time period between when he was placed in the administrative segregation unit in the evening of December 22, 2017 and mid-afternoon on December 25, 2017, except that he was barely able to move and stayed huddled under a blanket. He does not recall leaving the cell during that period.

18. The temperature in the administrative segregation unit was approximately 60 degrees, and a deputy, after remarking that "it is really cold in here," gave Mr. Twiford an extra blanket to go with the two he already had.

19. Mr. Twiford was unable to sleep and developed flu-like symptoms, which contributed to his mental deterioration.

20. On December 25, 2017 Mr. Twiford became more responsive, and he resumed his requests for medical attention. He said, "please help me," and "I'm hearing voices," and "I've got to get out of here" to passing deputies, including Deputies Hijar, Berumen, Vigil and Dionicio Franklin (who was not named as a defendant). He told many deputies that he was

hearing voices and would be killed if he stayed in the cell.  Deputy Berumen later reported that "Twiford had mentioned that they were all actors and he was supposed to get out because he was not supposed to be there."

21. PCDC incident reports produced later showed that original defendants Cardona and Hijar as well as Deputy Berumen knew of Mr. Twiford's symptoms but did nothing to help him or direct him to medical attention.

22. At approximately 5:10 p.m. on December 25, 2017 Deputy Franklin came to Mr. Twiford's cell to deliver a meal.  The latch on Mr. Twiford's cell through which meals were customarily served to inmates in the unit was broken.  Deputy Franklin had to open Mr. Twiford's cell door to deliver the meal.

23. When the door to the cell was opened, Mr. Twiford rushed at the exit, telling Deputy Franklin, "I'm leaving, get out of my way."

24. When Deputy Franklin reached out to try to prevent Mr. Twiford from leaving the cell, Mr. Twiford struck him multiple times and attempted to push him into the cell.

25. Deputy Berumen punched Mr. Twiford twice in the nose, breaking it.  Mr. Twiford injured a rib when he fell to the ground after being knocked out.

26. While Mr. Twiford was on the floor, Deputy Vigil dragged him.  Deputy Berumen deployed a can of OC spray at Mr. Twiford's eyes and tased him.

27. Mr. Twiford was treated at St. Mary Corwin Hospital for a broken nose and possible rib fracture and then brought back to the PCDC where he was placed in a different administrative segregation unit to await trial for charges based on his assault of Deputy Franklin.

28. Mr. Twiford alleges that his assault of Deputy Franklin was caused by a psychotic episode over which he had no rational control.

29. On December 26, 2017 Dr. Allen conducted a mental health evaluation of Mr. Twiford and concluded that he had an "Unspecified Psychotic Disorder." She prescribed Zyprexa (Olanzapine) to treat his psychosis.

30. On December 27, 2017 Ms. Hoggarth, one of the medical personnel employed by Correction Health Partners, visited Mr. Twiford to again check his mental health and indicated in her note that "Mh [Mental health] will continue to monitor him closely."

31. On December 28, 2017 Ms. Hoggarth checked on Mr. Twiford during medical rounds. She became aware that he was displaying behaviors consistent with psychosis, including neglect of personal hygiene and unwillingness to participate in any activity outside his cell, but she took no actions to address those symptoms.

32. Between December 27, 2017 and January 9, 2018 Mr. Twiford variously indicated to Ms. Hoggarth and Ms. Baynes in medical that his medicine was not working, and that he needed additional medications, but none was provided.

33. On January 9, 2018 Dr. Allen saw Mr. Twiford again. Her note indicates that this was "sooner than scheduled because he had been complaining to Mental Health clinician and midlevel provider that he needed more medication for sleep." He requested Seroquel, but Dr. Allen informed him that Seroquel was not in the Correction Health Partners formulary. Dr. Allen instead offered a substitute, Stelazine (Trifluoperazine).

34. Mr. Twiford alleges that Stelazine is an older generation antipsychotic medication; that Seroquel and Abilify are newer antipsychotics; and that there are notable

7

differences between the two types of medications in terms of effectiveness and disorders/symptoms treated.

35. Nevertheless, Mr. Twiford alleges that after he assaulted Deputy Franklin defendants took his pleas for help seriously, flagged him as needing mental health care, checked on him regularly, and provided antipsychotic medication for him.

36. Mr. Twiford was transferred out of the PCDC on January 11, 2018.

37. On a date not indicated, Pueblo County commissioned a "Comprehensive Jail Study" that determined that the jail was built to accommodate a maximum of 509 inmates, and that the jail ran efficiently at about 80% capacity. However, in the first six months of 2017 its average daily population was 777. In the fourth quarter of 2017, the jail was operating at 140% capacity.

38. The Health Services Contract between Correctional Health Partners and Pueblo County is based on a daily inmate population estimate of 620 and provides that "CHP will not charge PCSO for medical services above a monthly ADP [Average Daily Population] of 620 unless such demands require higher staffing levels by CHP."

39. Plaintiff alleges "[o]n information and belief," that no staffing increase was made in response to the increased population in the jail. ECF No. 36 at ¶246.

40. Correctional Health Partners agreed to pay the costs of medical care until it reached the agreed-upon "cap" of $200,000 for these services. Pueblo County would then be responsible for any amounts above the $200,000 cap. The contract provided that if Correctional Health Partners managed not to reach the $200,000 aggregate cap, then Correctional Health

Partners and Pueblo County would split the difference between outside medical care costs and the $200,000 cap, and Correctional Health Partners would keep its half as additional profit.

41.    Apparently quoting the jail study, plaintiff alleges that there were "minimal areas for inmates in special circumstances" such as those in "drug withdrawal" and those who are "infirm."  Also, "mental health patients and low-level drug offenders constitute a large portion of [Pueblo's] overcrowded jail population."  ECF No. 36 at ¶¶239, 241.

42.    The Pueblo County Sheriff admitted that overcrowding at the jail endangered the health and safety of inmates and staff.

## II.  FACTS JUDICIALLY NOTICED.

1.    Mr. Twiford, represented by counsel, pled guilty to Assault in the Second Degree in violation of Colo. Rev. Stat. § 18-3-203(1)(b).  ECF No. 48-1 (Plea Agreement).

2.    The statute provides, "A person commits the crime of assault in the second degree if . . . with intent to cause bodily injury to another person, he or she causes injury to any person by means of a deadly weapon."  *Id.*  Mr. Twiford agreed that there was a factual basis for the plea.  ECF No. 48-1 at 5.

3.    Mr. Twiford and the government stipulated to a sentence of five years in the Colorado Department of Corrections, plus three years parole, plus restitution to the victim in an amount to be determined, to be served concurrently with another sentence out of Jefferson County.  *Id.* at 1.

## III.  STANDARD OF REVIEW.

To survive a Rule 12(b)(6) motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face."  *Ridge at Red Hawk, L.L.C. v. Schneider*, 493

F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plausible claim is a claim that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the Court must accept the well-pleaded allegations of the complaint as true and construe them in the light most favorable to the plaintiff, *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002), conclusory allegations are not entitled to be presumed true, *Iqbal*, 556 U.S. at 681. However, so long as plaintiff's factual allegations raise the right to relief above the speculative level, he has met the threshold pleading standard. *See, e.g.*, *Twombly*, 550 U.S. at 556; *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008).

## IV. ANALYSIS AND CONCLUSIONS.

The claims remaining in the case at this point are (1) failure to provide medical care in violation of the Fourteenth Amendment against Captain Purkett and Deputies Berumen and Vigil; (2) failure to provide medical care in violation of the Fourteenth Amendment against Pueblo County; (5) violation of the Americans with Disabilities Act against Pueblo County; and (6) violation of the Rehabilitation Act against Pueblo County. The pending motion seeks dismissal of the First and Second Claims.

### A. Deliberate Indifference.

The Eighth Amendment, made applicable to the States by the Fourteenth Amendment, prohibits the imposition of cruel and unusual punishment. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (citation omitted).

Deliberate indifference has both an objective and a subjective component. *Farmers v. Brennan,* 511 U.S. 825, 834 (1994). Defendants concede for purposes of the pending motion that Mr. Twiford's need for medical attention was sufficiently serious to meet the objective component.

"The subjective component is met if a prison official 'knows of and disregards an excessive risk to inmate health or safety.'" *Sealock v. State of Colorado,* 218 F.3d 1205, 1209 (10th Cir. 2000) (quoting *Farmers,* 511 U.S. at 837). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmers, id.* The subjective component is met if prison officials intentionally deny or delay access to medical care. *Redmond v. Crowther,* 882 F.3d 927, 940 (10th Cir. 2018) (citing *Estelle,* 429 U.S. at 104-05). Thus, the subjective component would be met if a non-medical employee intentionally prevented an inmate from receiving treatment or denied him access to medical personnel qualified to determine whether he needed treatment. *See Sealock,* 218 F.3d at 1211.

### B. **Plaintiff's First Claim.**

Plaintiff's First Claim asserts that numerous correctional officers and medical personnel were deliberately indifferent to his reasonable medical needs, and as a result, he sustained injuries and damages, including his assault on Deputy Franklin that landed him in prison for five years. Deputy Vigil, Deputy Berumen and Captain Purkett are the only remaining individual defendants.

1. Deputies Vigil and Berumen.

Deputies Vigil and Berumen are included in long lists of other deputies and medical personnel who are all accused of ignoring his mental health needs. ECF No. 36 at ¶¶8, 10, 17, and 286-89. *See also id.* at ¶42 (all deputies in area where Mr. Twiford was housed). Nearly all the individuals in these lists have been voluntarily dismissed. This including all the medical personnel whose job it was to deal with medical issues in the jail. These allegations fall well short of facts showing deliberate indifference by Deputies Vigil or Berumen.

Plaintiff alleges that on December 25, 2017 Mr. Twiford, from his cell, called out "please help me," and "I'm hearing voices," and "I've got to get out of here" to passing deputies, including Deputies Vigil and Berumen, but also Deputies Hijar (who was dismissed) and Franklin (who was never named as a defendant). *Id.* at ¶125. Again, these allegations fall well short of showing deliberate indifference.

Deputy Berumen is alleged to have punched Mr. Twiford in the nose, used his OC spray on him, and tased him when Mr. Twiford's assaulted Deputy Franklin. *Id.* at ¶¶138, 141-42. Deputy Vigil is alleged to have dragged Mr. Twiford on the ground between Berumen's nose punch and OC spray. *Id.* at ¶141. However, whether the two deputies used excessive force to rescue Deputy Franklin and subdue Mr. Twiford is not the issue, as an excessive force claim has not been made. The events of the assault do not support a claim of deliberate indifference to Mr. Twiford's medical needs.

Plaintiff has not alleged that Deputy Vigil or Deputy Berumen intentionally prevented him from receiving medical care or denied him access to medical personnel. I find that plaintiff has not alleged facts that, even when construed in his favor, show deliberate indifference to his medical needs by Deputies Vigil and Berumen.

3. Captain Purkett.

Like Deputies Vigil and Berumen, Captain Purkett is lumped in with numerous other officers and health care workers in broad allegations that no one listened to or helped Mr. Twiford. ECF No. 36 at ¶¶8, 10, 11, 17, 42, 98, 101, 103, 168, 268. These allegations do not plausibly show that Captain Purkett knew of but disregarded an excessive risk to Mr. Twiford's health or safety. She believed that he was mentally ill, but she also was informed by an officer in the Denver jail where Mr. Twiford had been incarcerated earlier in the year that they had no record of his being on medication while he was there. *Id.* at ¶¶86, 94. It bears emphasis that Captain Purkett was not medically trained. She was not qualified to diagnose or to treat Mr. Twiford's mental illness. There were people in the jail and on call who were both qualified and responsible for provision of medical care to the inmates. Plaintiff has not alleged that Captain Purkett intentionally (or recklessly or knowingly) denied him access to the medical personnel.

Plaintiff's bigger complaint about Captain Purkett seems to be that she made the decision to move him into the administrative segregation unit, an action allegedly contrary to the thinking of the National Commission on Corrective Health Care, rather than putting him in a medical observation unit. *Id.* at ¶¶90-93. That may or may not have been the wrong decision, but there is a difference between a wrong decision and a knowing disregard of an excessive risk to an inmate's health and safety. Deliberate indifference requires more than negligence. I find that plaintiff has not stated a plausible claim of deliberate indifference to his medical needs against Captain Purkett.

**C. Plaintiff's Second Claim.**

13

Plaintiff's Second Claim asserts that Pueblo County maintained "deliberately indifferent policies, practices, habits, customs, procedures, training and supervision of staff with respect to the provision of medical care and treatment for inmates." ECF No. 36 at ¶30.  Essentially, the claim is that Pueblo County contracted with Correctional Heath Partners to provide medical care for the jail's inmates but did not provide enough funding or supervision to assure that all inmates received the care they needed.

Inmates cannot provide their own medical care.  Therefore, the state or municipality has a non-delegable constitutional duty to provide necessary and adequate medical care for its inmates. *See West v. Adkins,* 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relief the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights.").  Although the non-delegable duty doctrine has not yet been addressed by the Tenth Circuit, it has been upheld numerous times in this district, including by me, and by several circuit courts. *Estate of Lovern by and through Daily v. Correct Care Solutions, LLC,* No. 18-cv-02573-KLM, 2019 WL 2903589, at *3-7 (D. Colo. July 3, 2019) (collecting cases).

I find that plaintiff has alleged facts plausibly showing that the PCDC did not provide adequate care and treatment for his mental illness between December 21 and 25, 2017.  It is not a matter of Pueblo County's being vicariously liable for the actions of its employees.  It is a matter of Pueblo County's alleged failure to honor its own non-delegable duty to provide adequate medical care to every inmate, including Mr. Twiford.

Whether the medical services provided to Mr. Twiford were, in fact, inadequate is not an issue that can be resolved on a Rule 12(b)(6) motion.  Likewise, whether and to what extent Mr.

Twiford sustained injuries as a result of the allegedly inadequate care he received during those five days in December 2017 cannot be resolved at the motion stage.[1]

## V.  ORDER.

Defendants' partial motion to dismiss, ECF No. 48, is GRANTED IN PART AND DENIED IN PART.  Plaintiff's claims against defendants Sandy Purkett, Nicolas Berumen and Robert Vigil are dismissed with prejudice.  The motion is denied as to the Board of County Commissioners of Pueblo County.  Thus, what remains in this case are the Second, Fifth and Sixth Claims for Relief, all asserted against Pueblo County.

DATED this 4th day of June, 2020.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge

---

[1] Establishing that a psychotic episode resulting from defendants' deliberate indifference caused his assault of Deputy Franklin and the resulting conviction and sentence is problematic.  Mr. Twiford pled guilty to Second Degree Assault, which is a crime that requires a specific intent to inflict bodily injury on the victim, and in doing so he expressly acknowledged that there was a factual basis for his plea.  In his response brief he emphasizes that he is not challenging his conviction or sentence.  ECF No. 62 at 18.